477 A.2d 527

**In re JONES & LAUGHLIN STEEL CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 26, 1983.

Filed June 1, 1984.

Reargument Denied Aug. 14, 1984.

Petition for Allowance of Appeal Denied Jan. 9, 1985.

444

James H. McConomy, Pittsburgh, for appellant.

Before CAVANAUGH, MONTGOMERY and HESTER, JJ.

CAVANAUGH, Judge:

This is an appeal by Jones & Laughlin Steel Corporation from an order of the Allegheny County Common Pleas Court which awarded dissenting shareholders the sum of $113.30 for each share owned by the dissenters as well as an award to the dissenters' counsel.[1] The award was made in an appraisal proceeding under § 515 of the Pennsylvania Business Corporation Law, 15 Pa.S.A. § 1515. The history preceding this award involves a number of entities involved directly or indirectly in a Plan of Merger which took effect in November of 1974. The corporate entities were:

LTV Corporation (LTV), Parent

Jones and Laughlin Industries (J & L I), Subsidiary of LTV

JLI–II Corporation, Subsidiary of Jones and Laughlin Industries

Jones and Laughlin Steel Corporation (J & L), merged and into JLI–II

1. The opinion of the court below set forth the following calculations relating to the amount to be paid to dissenting shareholders:

| | |
|---|---:|
| Fair value per share of J&L stock as of November 22, 1974 | $ 54.00 |
| Interest per share of J&L stock from November 22, 1974 to December 30, 1982 | 71.09 |
| Total value of a share of stock plus interest | $125.09 |
| Less: Amount allowed for attorneys' fee per share | 11.79 |
| Net amount to be paid to dissenting shareholders for each share | $113.30 |

At the time of the merger JLI–II was already the holder of approximately 81% of the shares of J & L. For most purposes on this appeal, we need only to refer to Jones and Laughlin Steel Corporation (J & L). The Business Corporation Law provides for judicial determination of fair value when shareholders wish to dissent to a merger plan. Appellant, J & L, instituted the present action to determine fair value, on the basis, it states, that certain shareholders had elected to exercise their dissenters' rights. Before the institution of this action, however, a class action had been initiated in the United States District Court for the Southern District of New York. This case has been referred to by the parties herein as the *Tanzer/Voege* case. In that case, dissenting shareholders made a series of allegations which included, *inter alia*, claimed violations of provisions of the Securities Exchange Act of 1934 and regulations thereunder. Multiple relief was sought including injunctive relief, a declaration that the plan and merger be declared null and void and damages amounting to the difference between the merger price of $29.00 a share and fair market value of the J & L stock held by the class.

The *Tanzer/Voege* litigation resulted in a settlement agreement which was finally approved by the court in July of 1980.

Meanwhile, in the present Pennsylvania action, certain dissenters sought to have the merger declared invalid. This resulted in an appeal to this court which determined that under the Pennsylvania Business Corporation Law the remedy of appraisal is exclusive and there is no alternative of recission. *In re Jones & Laughlin Steel Corp.*, 263 Pa.Super. 378, 398 A.2d 186 (1979). The Supreme Court affirmed. *In re Jones & Laughlin Steel Corp.*, 488 Pa. 524, 412 A.2d 1099 (1980). Following these appeals, the Allegheny County court proceeded with the appraisal hearings. J & L sought in the trial court to dismiss the claims of those who had not chosen to opt out of the *Tanzer/Voege* class action, or alternatively to dismiss the claims of those who had executed releases in the *Tanzer/Voege* settlement. The

trial court refused these dismissal motions without determination of the specific merits, since it felt constrained to proceed to the appraisal by mandate of the previous appellate court opinions.

# I

## WAIVER ISSUE

■ Preliminarily, the dissenters have argued on appeal by Motion to Dismiss, that appellant has waived the issues sought to be raised on appeal since the appeal was taken directly from the trial court's adjudication. Even though, say the dissenters, the appellant filed exceptions below and cross-exceptions were filed thereto, the appeal was taken before the exceptions were argued and the lower court was thus deprived of jurisdiction. Pa.R.A.P. 1701(b). Appellant answers that "statutory proceedings" under § 515 of the BCL are not governed by the Pennsylvania Rules of Civil Procedure unless specifically provided. *Fort Pitt Bridge Works v. Malabar Construction, Inc.*, 116 P.L.J. 352 (1967) is cited in support of direct appealability. We need not decide this issue and will proceed to consider the merits for a number of reasons. First, we note that appellant, confessing to "procedural uncertainty," pursued dual post-trial actions, i.e., exceptions were filed *and* an appeal was taken to this court. Thus, if the appeal were to be quashed as procedurally defective, appellant could proceed below. The lower court has concluded in its adjudication, that it was compelled to proceed with the appraisal action by reason of the mandate of this court, affirmed by the Supreme Court.[2] In addition, the court denied the petition to dismiss the action on the basis of *res judicata*, estoppel and waiver for

---

**2.** Opinion of Ralph H. Smith, Jr., J.

In accordance with the order of our Superior Court of February 7, 1979 which was affirmed by our Supreme Court on March 20, 1980, this court is under "instruction to proceed with the appraisal action." These instructions finally resolved this court's jurisdiction and just what function it was to perform, i.e., we are to proceed with the appraisal action. This is the law of the case. (Footnote omitted.)

essentially the same reasons. The court's denial was on the basis that "[the dissenting shareholders] have had their right to appraisal adjudicated to finality by two appellate courts of this Commonwealth, to wit, the Supreme and the Superior." We need not opine as to whether the court properly interpreted the mandate of this court and the Supreme Court. Suffice it to say that there is no reason to conclude that if the matter were quashed the court would act other than it already has, i.e., determine that the threshold question of entitlement to participate in the appraisal action was foreclosed by the orders of our appellate courts. On the other hand, to give instruction to the court would be inconsistent with quashing the appeal. Dissenting shareholders, while arguing the impropriety of the appeal without disposition of the exceptions, retreat in their brief from a motion to dismiss the appeal, to a request for direction to the lower court to consider the exceptions while presumably retaining appellate jurisdiction. Finally, at oral argument, appellees asked that we consider the appeal on the merits.

In view of the fact that the issues are ones of law, that the trial court has read our prior decision, affirmed by the Supreme Court as precluding consideration of the threshold entitlement question on the merits; and the passage of time since the inception of their litigation, we accept the facial propriety of the appeal and address the merits.

## II

The argument on appeal is that the court erred in not dismissing the claims of those who had not opted out of the *Tanzer/Voege* class. It is claimed that participation by these dissenters in the appraisal action should be barred under the doctrines of *res judicata*, collateral estoppel and choice of remedy. It is further argued that the present claims are barred by reason of a release given on behalf of the *Tanzer/Voege* class by its representative and in certain cases, by individual releases given by certain dissenters in order to participate in distribution by the settlement fund. Stated simply, the issue is, does failure to opt out of

*Tanzer/Voege* preclude a dissenting shareholder from the benefit of the present appraisal action?

Appellant concedes that dissenters could pursue both the *Tanzer/Voege* suit and the appraisal action but that a judgment adjudicating these rights in *Tanzer/Voege* prohibits further pursuit of the appraisal claim.

 *Res judicata* applies when, in two actions, there is (1) an identity in the thing sued upon (2) identity in the cause of action (3) identity of persons and parties to the action, and (4) identity of the capacity of the parties suing or sued. *Duquesne Slag Products Co. v. Lench*, 490 Pa. 102, 415 A.2d 53 (1980); *Bearoff v. Bearoff Bros., Inc.*, 458 Pa. 494, 327 A.2d 72 (1974).

 The essential inquiry is whether the ultimate and controlling issues have been decided in a prior proceeding in which the parties had an opportunity to appear and assert their rights. *Callery v. Municipal Authority of Blythe*, 432 Pa. 307, 243 A.2d 385 (1968); *Schultz v. City of Philadelphia*, 314 Pa.Super. 194, 460 A.2d 833 (1983); *Notoro v. Estate of Hyer*, 239 Pa.Super. 10, 361 A.2d 766 (1976). In making this evaluation our courts have looked to the basic issues and the harm sought to be remedied in the separate suits. *Duquense Slag Products Co. v. Lench, supra; Safeguard Mutual Insurance Co. v. Williams*, 463 Pa. 567, 345 A.2d 664 (1975). For a prior class action judgment to bar an action on the basis of *res judicata* the parties must be identical in both suits; the prior judgment must have been entered by a court of competent jurisdiction; there must have been a final judgment on the merits and the same cause of action must be presented in both cases. *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

 As to the identity of cause of action, rather than resting on the specific legal theory invoked, *res judicata* generally is thought to turn on the essential similarity of the underlying events giving rise to various legal claims. Whatever the conceptual difficulties inherent in the defini-

tion of a "cause of action" often the presence of a single cause of action is clear. *Davis v. United States Steel Supply,* 688 F.2d 166 (1982), *cert. denied* 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (applying Pennsylvania law). The *Davis* court recognized that in determining whether a single cause of action is present one may consider the identity of the acts complained of, the demand for recovery, the identity of witnesses, documents and facts alleged. A lack of identity of these facets would, of course, support the conclusion that there is no identity of cause of action.

█ Appellant in making its *res judicata* argument has made only broad out-of-context references to the *Tanzer/Voege* litigation. A separate examination of each of these actions leads us to conclude that there is no identity of cause of action between *Tanzer/Voege* and the present appraisal proceedings. In *Tanzer v. Haynie,* 405 F.Supp. 650 (1976) Judge Frankel described the complaint in the consolidated cases arising out of federal court suits filed as a result of the merger:

> The complaint—naming as prime defendants directors of the several corporations and the corporations themselves alleges, *inter alia,* a series of misrepresentations and omissions in the proxy material that J & L Steel submitted to its shareholders prior to the merger, and seeks, in five counts, money damages, injunctive relief and a declaration of rights.

> Count I alleges violations of Section 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78n(a) (1970), and Rules 10b–5 and 14a–9 promulgated thereunder, 17 C.F.R. §§ 240.10b–5 and 240–14a–9 (1975).

and further:

> Count I seeks damages amounting to the difference between the price of $29.00 a share and the fair value of the J & L stock held by plaintiff class. Count II, brought pursuant to the same facts as Count I, and seeks damages for deprivation of the benefits and incidents of ownership. Count III is a derivative count, incorporating many of the same factual allegations as Count I, which

alleges that the merger has no plausible business purpose of J & L Steel, and that the terms of the merger are so grossly unfair to J & L Steel and reflect such a clear abuse of trust as to render the merger a fraud on J & L Steel. This count seeks injunctive relief as well as a judgment declaring the plan and merger to be null and void. Count IV is brought pursuant to Pennsylvania law, alleging the same facts as those in Count I, and seeking again the Count I and II remedies. Court V is a derivative count against all but Lionel D. Edie & Company seeking remedies identical to those sought in Count IV.

The court, after opining that the suit should not be dismissed went on to state:

> None of this is to suggest that the "fairness" of a transaction is, as such, a matter for federal scrutiny. What the federal law does undertake to ensure, however, is that "shareholder approval is fairly sought and freely given," so that the public shareholders are positioned not only to effect "an intelligent exercise of their appraisal rights," but also to pursue possible state remedies against unfair compulsion. (Citations omitted.)

The final disposition of the *Tanzer* litigation is summarized in Federal Securities Law Reports C.C.H. 97,940

> Suit to bar consummation of the merger was commended, [sic] and violations of Section 10(b) and 14(a) of the Exchange Act were alleged. The gravamen of the claims asserted was that the proxy materials which made the merger proposal seem fair were, in fact, false and misleading. Moreover, it was alleged that the merger proposal and the price paid for the publicly held shares was grossly unfair. On November 20, 1974, injunctive relief was denied,

> . . . .

> In approving the settlement agreement, the court noted that the settlement was virtually unopposed. Although the lone objector did not formally withdraw his objections, he did not press his claim at the hearing. The most

cognizable claim under the federal securities law was that defendants violated a duty of full and fair disclosure. It was clear that successful litigation on that issue was uncertain.

It is apparent that the gist of the federal class action was a claim based upon false and misleading information in the proxy supporting the merger proposal and the failure to give full and fair disclosure under securities laws. It is only in reference to claimed damages that the "fair value" of the $29.00 offer is called into reference for the calculation of damages.

The *Tanzer* litigation is to be contrasted to the appraisal claim under the Business Corporation Law—Rights of Dissenting Shareholders, where the only relief available is a "judgment against the corporation for the amount of the fair value of their shares...." 15 P.S. § 1515(F). This limitation has been recognized by our Supreme Court in the present case upon prior appeal where it was determined that the appraisal remedy was the exclusive right which could be pursued in the present action. The court further recognized that dissenters could seek relief for unfair or fraudulent corporate actions in separate actions. *See In re Jones & Laughlin Steel Corp., supra,* 488 Pa. 532–3, 412 A.2d at 1103–4. Thus, our highest court has recognized in this very case that separate and distinct causes of action may be pursued as the result of the same purchase offer.

Counsel for the dissenting shareholders has characterized these shareholders in his brief as mostly having small holdings and not represented by private counsel throughout the federal securities litigation. This is borne out by paragraph 5 and Exhibit A of J & L's petition which commenced the present suit. It describes the dissenters as being 122 in number and owning 25,305 shares. At the outset of the hearing below, the court was advised that stock held by active dissenters at that time was only 8,202 shares. The operation of sophisticated doctrines relating to prior judgments would be particularly harsh in this factual setting. The shareholders presumably were satisfied to maintain

their status when they were met with the buy out tender price on a take-it-or-leave-it basis. They were then advised of a federal class action in New York and given the choice to be represented in the class or to "opt out." Meanwhile, the statutory appraisal action was begun, in Allegheny County *by J & L*. Thus, the bewildered small shareholder, whose initiative did not play a role in any of these proceedings would seem to be, at least potentially, an unwary victim of the complexities of *res judicata*, collateral estoppel, bar by consent judgment, election of remedies, and release.

The significance of the defenses interposed in bar of the present proceedings is apparent. The federal proceedings were ultimately settled on a basis which awarded $.30 to $.50 per share of J & L common stock. The order in the present proceedings including interest is for $113.30 for each share. The view of the federal court as to the likely success of the federal class action was borne out by the meager settlement which ultimately ensued.[3] It is clear that the class action was not the same cause of action as the present one and, therefore, the defense of *res judicata* is rejected.

We conclude that there is no identity in the cause of action between the present statutory appraisal action and the *Tanzer/Voege* cases since the gravamen of the latter claim was to seek multiple relief which only incidentally sought to assert damages based upon the failure of the tender offer to represent "fair value" for the shares. The similarity as to one aspect of the relief sought does not create an identity of cause of action. As has been noted, the gravamen of *Tanzer/Voege* was that the merger was based on false and misleading materials and that there was

3. Judge Frankel stated in *Tanzer v. Haynie*, at 405 F.Supp. 650 (1976):
 When the first of the non-consolidated cases was brought, plaintiffs moved for a preliminary injunction. Upon the learning, swiftly acquired then, the court perceived only slender prospects that plaintiffs would eventually succeed on the merits.... Though more than a year has passed, the matter has not developed enough to justify any different attempt to forsee its outcome.

not a full and fair disclosure—a claim that our highest court has held may not be asserted in the present action.

Similarly, our study of the *Tanzer/Voege* suit makes it clear that the simple determination of fair value for the J & L stock was not the basis of that suit nor was it an issue that was litigated therein. Thus, the doctrine of collateral estoppel cannot apply. *Riverside Memorial Mausoleum, Inc. v. UMET Trust,* 581 F.2d 62 (1978), *Schubach v. Silver,* 461 Pa. 366, 336 A.2d 328 (1975). Certainly, it cannot be argued that a determination of fair value was essential to the settlement and consequent judgment of *Tanzer/Voege, Riverside Memorial Mausoleum v. UMET Trust, supra; Lynne Carol Fashions, Inc. v. Cranston Print Works,* 453 F.2d 1177 (1972); *Long v. Long,* 306 Pa.Super. 142, 452 A.2d 255 (1982); *Oak Lane Shopping Center, Inc. v. Flame,* 264 Pa.Super. 9, 398 A.2d 721 (1979); *Lebeau v. Lebeau,* 258 Pa.Super. 519, 393 A.2d 480 (1978).

Appellant further argues that:

A. the consent judgment bars all claims which were or could have been brought in the prior action.

B. the doctrine of election of remedies requires the dismissal of the claims of the non-opting out dissenters.

C. the claims asserted by the dissenting shareholders are barred by the release executed by the representatives of the plaintiffs in the *Tanzer/Voege* case.

D. the individual releases executed by those dissenters who submitted proofs of claim in *Tanzer/Voege* bar the claims of those dissenters in this action.

As to the Consent Judgment issue, we have assumed in our discussion as to *res judicata* that the consent judgment may have *res judicata* effect. This is the law in our jurisdiction. *Pennsylvania Human Relations Commission v. Graybill, Inc.,* 482 Pa. 143, 393 A.2d 420 (1978); *Lukacko v. Macerino,* 192 Pa.Super. 4, 159 A.2d 235 (1960); *Commonwealth v. Borough of Carlisle,* 16 Pa.Cmwlth. 341, 330 A.2d 293 (1974). However, the Consent Judgment was a judgment only as to the matter in litigation and we

have decided that the present cause of action is not barred by the claim asserted in *Tanzer/Voege.* Thus, a consent decree may not be used as a bar to a subsequent claim which was not in the contemplation of all parties consenting to the judgment. *See Keystone Building Corp. v. Lincoln S. & L. Assn.,* 468 Pa. 85, 360 A.2d 191 (1976). Nor, as previously stated, do we think the consent judgment can be interpreted as implicating the doctrine of collateral estoppel for the purpose of defeating the present fair value proceedings.

Again, arguing that the federal proceeding involved a determination of fair value it is argued that the doctrine of election of remedies precludes pursuance of the present action. Suffice it to say that we have already considered that the federal litigation cannot reasonably be interpreted as one which seeks a fair value appraisal and, thus, the election of remedies doctrine has no applicability. There is no identity of cause of action, rights asserted or relief sought. *See Cunningham v. Joseph Horne Co.,* 406 Pa. 1, 176 A.2d 648 (1961).

At the conclusion of the federal action, the representatives of the class entered into a stipulation of settlement which, *inter alia,* included the following language releasing J & L from liability in the following pertinent language:

> [The plaintiffs released J & L from all claims] arising from or in any manner relating to the acts, omissions, facts, matters or transactions asserted in the Consolidated Amended and Supplemental Complaint in the aforesaid consolidated action, or which might have been asserted in that complaint on the basis of or arising from the acts, omissions, facts, matters and transactions alleged in that complaint or arising out of the prosecution, defense, settlement and compromise of the aforesaid consolidated action or any proceeding, whether civil, criminal, administrative or investigative, or directly or indirectly arising out of or related to matters referred to in that complaint.

The effect of a release must be determined from the ordinary meaning of its language. *Wolbach v. Fay,* 488 Pa. 239, 412 A.2d 487 (1980). It ordinarily covers only such

matters as can fairly be said to have been within the contemplation of the parties when given. *Gateway Center Corp. v. Merriam,* 290 Pa. 419, 434 A.2d 823 (1981); and *In re Estate of Bodnar,* 472 Pa. 383, 372 A.2d 746 (1977). From a reading of the release language quoted above and in consideration of our discussions as to the lack of identity between the present action and the federal class action, we conclude that the release does not have the effect of precluding this proceeding. For the same reasons we reject the argument that the individual releases executed by those dissenters who submitted proofs of claim in the federal action preclude their participation in the present action.

We finally reject appellant's claim in bar of the present appraisal action.

### III

The next issue raised on appeal by J & L relates to the trial court's determination of the fair value of the J & L stock at $54.00 per share. This appraisal was reached by the court after conducting extensive hearings which were reflected in a transcript covering 1,760 pages. We first look to the case of *Appeal of O'Connor,* 444 Pa. 206, 283 A.2d 279 (1971) in order to determine our scope of review. In that appeal from the trial court adoption of the findings of an appraiser in proceedings under § 515 of the Business Corporation Law the court stated:

> Our review of this appeal encompasses only an ascertainment of whether the findings of the trial court are supported by competent and substantial evidence. We reject appellant's request that we make an independent determination as to the fair value of her shares: "This court does not sit as a trier of issues of fact expecting to be persuaded that one or the other side is more credible. That is only a task for the trial court and we would never invade that area of the judicial process." (Footnotes and citations omitted).

*Appeal of O'Connor, supra,* 444 Pa. 209, 283 A.2d at 280.

The *O'Connor* court further noted that substantial evidence is more than a scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.

After remand, the *O'Connor* case underwent an appraisal based on the previous record by the trial court without the appointment of an appraiser. On appeal from that adjudication our Supreme Court adopted the use of three methods of evaluation to be considered in the judicial determination of intrinsic value for fair value purposes. These factors are (1) net asset value (2) actual market value and (3) investment value. The court noted the following definitions of these methods.

7. *Net Asset Value* is the share which the stock represents in the value of the net assets of the corporation. Such assets include every kind of property and value, whether realty or personalty, tangible or intangible, including good will and the corporation's value as a going concern.

*Investment Value* is an estimate of present worth in light of past, present and prospective financial records of the company and is obtained by capitalizing earnings. There are two basic steps in the capitalization process: calculation of a representative annual earnings figure, and choice of a capitalization ratio which reflects the stability and predictability of earnings of the particular corporation.

*Market Value* refers to the price at which the stock was selling on the market prior to the action which is objected to, disregarding any change in price due to the action.

*O'Connor Appeal,* 452 Pa. 287, 288, 292, 293, 304 A.2d 694, 698 (1973).

Both parties agree that *O'Connor* is the controlling case as to the standards for statutory appraisal proceedings under the Pennsylvania B.C.L. The lower court in compliance with these standards evaluated the testimony including the two experts who testified on behalf of J & L. Witness Gilbert E. Matthews concluded that the market value of J & L shares on the date of the merger was

between $19.00 and $23.00 per share; and that the investment value was $15.00 to $16.00 on a seven year average earnings basis and $22.00 to $26.00 on a one year average. He equated the asset value to investment value and after assigning weights of fifty percent to market value, forty percent to investment value and ten percent to asset value arrived at a fair value of $19.00 to $20.00 per share. J & L witness Eugene Frank opined that the J & L asset value was from $13.46 to $18.06 per share. Witness Ehrgott, for the dissenters, concluded in his testimony that the J & L assets and inventories were undervalued and were in fact worth $145.38 per share. The court noted the difficulty of determining the fair market value as of November 22, 1974 based on this evidence.

In deciding the issue the court rejected the investment value method of evaluation since it concluded that J & L under the control and management of LTV seriously underestimated the earnings of J & L because of this and LTV's control over J & L's earning picture, its records and dividends there was no fair basis upon which to use the investment values of evaluation.

As to market value, the court observed that when LTV was attempting to acquire a dominant position in J & L it made an offer of $85.00 per share and that as a result of this offer and subsequent purchases by LTV, it was able to achieve ownership of eighty-one percent of the outstanding common stock at the time the present merger offer was made. This control, the court concluded, permitted LTV a "controlling and restrictive" effect on the market value on the remaining shares traded on the market. The court further noted that the $29.00 per share offer effectively put a ceiling on the market trading price of the shares and stated that in the recent past the announcement of an increase in earnings (though in fact understated) was not proportionately reflected in the market price of the stock. Thus, the market value method was also rejected.

Finally, the court in accepting the net asset value method concluded:

## C. THE NET ASSET VALUE METHOD OF EVALUATION

Although there is a great variance in the facts presented, we feel that the net asset value method and this method alone is the most responsible vehicle for determining the fair value of J & L's common stock. While there is credible evidence in the record that the assets of J & L were greatly undervalued, there is also correspondingly credible evidence to the effect that the liability portion of its balance sheet did not completely reflect its unfunded pension commitments. We accept, only because of the nature of the record which we have before us, the balance sheet of J & L as of that period when the proposed merger was to become effective as most nearly reflecting the true and accurate fair value of its common stock. That value, according to J & L's own balance sheet statement, is $54 per share.

While the mandate of O'Connor is that the appraising court *consider* the three methods of valuation, it does not require that after consideration, actual weight be ascribed to any of the valuation methods in attempting to determine a fair value. The goal of fairness would suggest the opposite: i.e., once there has been a determination that a method of evaluation is of no assistance or would be misleading, it should not become a component of the final determination. We note, for example, that in *O'Connor I* the court observed that since the shares of the subject company were not traded on a public market, the market value theory would have no applicability.

The record supports the conclusion that the market value was unreliable. The purchase of the J & L minority interest was characterized as an "acquisition." Market uncertainty was undoubtedly affected by the fact that the majority acquiring interest offered $25.00 in August, 1974 for the minority shares, and within weeks changed the offer to $29.00. An expert witness for J & L agreed that when the majority interest was obtained by the LTV interests in 1968 the offer ($85.00) was eighteen times current earning

compared with the present offer of four times earnings. In the interim, the control exercised by LTV over the fortunes of J & L and, therefore, the market value of its stock cannot be denied. The market picture was further complicated by an understatement of earnings during a period relevant to the market valuation. From our review of the record in this case, we conclude that there was competent and substantial evidence to support the appraisal court's conclusion that market value be rejected as a reliable method for evaluating the fair value of J & L stock. The record similarly supports the rejection of the investment value method since there is credible evidence that the earnings under the circumstances did not present a fair picture for the calculation of investment value.

The court also heard extensive evidence on the net asset value method of evaluation. There was evidence of the cash and liquid assets held by J & L which, of course, would not be subject to the argument that book value in a going concern should be discounted. The court heard offsetting arguments as to depreciation, value of coal and iron ore reserves and other aspects of the determination of fixed value. While appraisers could differ as to the true asset value, we believe that the court did not err in finally accepting the asset value from J & L's own balance sheet in the sum of $54.00.

It is argued that the court erred in failing to consider as evidence on the fair value issue the affidavit of counsel for the plaintiffs in the *Tanzer/Voege* case. That affidavit was submitted in support of the proposed settlement. While it is not entirely clear that the court did *not* consider the affidavit, we conclude that it would not be error not to consider it. The conclusory opinion in that affidavit is of insignificant value when compared to the great mass of specific documented evidence presented to the court bearing on the issues in the appraisal proceeding. The *Tanzer/Voege* affidavit, of course, only dealt with the expectations of success on the liability of the defendants in that litigation which we have determined to be entirely different

from the present case. To the extent that the affidavit, advocating approval of a settlement, discounted the hope of success in demonstrating the market asset or investment value in excess of $29.00 it certainly could not and should, in any event, deter the present court from discharging its duty to make an independent appraisal based on the abundant evidence before it.

We further conclude that the record supports the trial court's conclusion that a 10.5% interest calculation is proper to compensate the dissenting shareholders for the deprivation of the use of the fair value of their stock from the effective date of the merger plan.

Order affirmed. Remanded for entry of judgment. Jurisdiction relinquished.