665 A.2d 504

**Russell L. BROWN, Sr., and Roselyn Brown, His Wife, Appellants**

**v.**

**Jay B. HERMAN, M.D.**

Superior Court of Pennsylvania.

Submitted July 24, 1995.

Filed Sept. 25, 1995.

306

Steven Savor, Jr., Pittsburgh, for appellants.

James A. Wood, Pittsburgh, for appellee.

Before McEWEN, TAMILIA and OLSZEWSKI, JJ.

TAMILIA, Judge:

Russell L. Brown and Roselyn Brown, his wife, appeal from the May 19, 1994 Order granting appellee's motion for summary judgment. Summary judgment was entered on the basis that a release signed by appellants in a prior products liability action precluded their subsequent medical malpractice suit against appellee.

On January 5, 1987, appellant Russell Brown was injured when the stool on which he was sitting collapsed. Appellants brought suit against the manufacturer and retailer of the stool alleging various injuries ("products liability action"). On May 14, 1989, appellee, Dr. Jay B. Herman, surgically implanted a penile prosthesis in appellant Russell Brown. On July 27, 1990, appellants filed suit against appellee alleging negligent implantation of the prosthesis ("medical malpractice action"). Thereafter, on December 6, 1991, appellants filed a supple-

mental pretrial statement in the products liability action in which they alleged, inter alia, that the penile prosthesis surgery was necessitated by impotence caused by the 1987 accident. On January 29, 1992, appellants settled their products liability action for $250,000 and executed a release which reads, in relevant part:

## FULL AND FINAL RELEASE

FOR AND IN CONSIDERATION of the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) to us in hand paid by Admiral Industries, Montgomery Ward & Company and Scottsdale Insurance Company, the receipt of which is hereby acknowledged, we, Russell Brown and Roselyn Brown, being of lawful age, hereby fully and forever release, acquit and discharge the said Admiral Industries, Montgomery Ward & Company and Scottsdale Insurance Company (Releasees) AND ANY AND ALL OTHER PERSONS, INSURERS, FIRMS, PARTNERSHIPS AND CORPORATIONS which are or might be claimed to be liable to us, our heirs, administrators, executors, successors and assigns from any and all actions, causes of action, claims and demands of whatsoever kind or nature on account of any and all known and unknown injuries, losses and damages by us or our property sustained or received on or about the 5th day of January, 1987, when an incident occurred at our residence where I, Russell Brown, fell from a chair/stool, and about which specific allegations were made by us in pleadings filed at the below docket number for which injuries, losses and damages we claimed the said Admiral Industries, Montgomery Ward & Company and Scottsdale Insurance Company to be legally liable and on account of which suit was brought at No. G.D. 88–04918 in the Court of Common Pleas of Allegheny County, it being understood and agreed that the acceptance of said sum is in full accord and satisfaction of a disputed claim and that the payment of said sum is not an admission of liability by the above named Releasees.

It is expressly understood and agreed that this release and settlement is intended to cover and does cover all now known injuries, losses and damages to us and also any future injuries, losses and damages not now known or anticipated, but which may later develop or be discovered, including all the effects and consequences thereof[.]

(R.R., p. 54.)

On May 19, 1994, the day scheduled for the trial of appellants' medical malpractice action, appellee's counsel obtained this release and presented it to the trial court. Citing the pretrial statement filed on December 6, 1991, appellee claimed that since the impotence, and hence the need for a penile prosthesis, arose as a result of the 1987 accident, the above-quoted release barred appellants' suit against appellee. The trial court agreed and granted appellee's motion for summary judgment. The court subsequently denied appellants' motion for reconsideration and this appeal followed.

The award of summary judgment to appellee was based on the trial court's reading of *Buttermore v. Aliquippa Hospital,* 522 Pa. 325, 561 A.2d 733 (1989). In *Buttermore,* the plaintiff was injured in an automobile accident caused by another driver, Frances Moser, and transported to the defendant-hospital by ambulance. Plaintiff subsequently settled her claim against Moser for $25,000 and executed a release which provided:

I/We being of lawful age, for myself/ourselves, my/our heirs, administrators, executors, successors and assigns hereby remise, release, acquit and forever discharge Frances Moser, *et al.* His/her successors and assigns, and/or his, her, their, and each of their associates, heirs, executors and administrators and any and all other persons, associations and/or corporations, whether known or unknown, suspected or unsuspected, past, present and future claims, demands, damages, actions, third party actions, causes of action, or suits at law or in equity, indemnity of whatever nature, for or because of any matter or thing done, omitted or suffered to be done, on account of or arising from damage to property, bodily injury or death resulting or to

result from an accident which occurred on or about the 3rd day of December, 1981 at or near Aliquippa, Pennsylvania for which I/We have claimed the said Frances Moser, *et al.* to be legally liable, but this release shall not be construed as an admission of such liability.

Thereafter, plaintiff instituted suit against the defendant-hospital alleging negligent treatment of her accident-related injuries. The hospital raised the Moser release in defense and the trial court granted summary judgment on that basis. We reversed and the Supreme Court granted allocatur. The Supreme Court began its analysis by characterizing the issue before it as "the effect to be accorded a release which by its terms discharges all claims and parties thereto even though it results in the discharge of others who have not contributed consideration toward the release." *Buttermore, supra* at 325, 561 A.2d at 735. The plaintiff argued that it was never his intent, in signing the release, to discharge the hospital from liability. The Court, construing the "ordinary meaning" of the release, *id.,* found that a release given to a particular individual and "any and all other persons" barred subsequent suits against all tortfeasors whether or not they are specifically identified in the release. *Id.* In holding that the Moser release barred plaintiff's subsequent medical malpractice action, the Court noted as follows:

Parties with possible claims may settle their differences upon such terms as are suitable to them. they may include or exclude terms, conditions and parties as they can agree. In doing so, they may yield, insist or reserve such right as they choose. If one insists that to settle, the matter must end then and forever, as between them, they are at liberty to do so. They may agree for reasons of their own that they will not sue each other or any one for the event in question. However improvident their agreement may be or subsequently prove for either party, their agreement, absent fraud, accident or mutual mistake, is the law of their case.

In the instant case there is no allegation of fraud, accident or mutual mistake, therefore, as between them their agreement is their law.

*Id.*

■ Instantly, we agree with the trial court that the release executed by appellant is quite similar to the release executed in *Buttermore.* When read without extraneous language, the release presently before us reads as follows:

For ... $250,000 ... [the plaintiffs] ... hereby fully and forever release ... the said [defendants] ... AND ANY AND ALL OTHER PERSONS ... AND CORPORATIONS which are or may be claimed to be liable to us ... from any and all actions ... on account of any and all known and unknown injuries ... sustained or received on or about the 5th of January, 1987, when an incident occurred at our residence where [plaintiff] fell from a chair/stool, and about which specific allegations were made by us in pleadings filed at the below docket number....

It is expressly understood ... that this release ... is intended to cover ... all now known injuries ... and also any future injuries ... not known or anticipated, but which may later develop ... including all the effects and consequences thereof.

Thus, the "ordinary meaning" of this release is that appellants relinquished all right to pursue actions against all persons for all injuries, known or unknown, arising out of appellant-Russell Brown's fall from the stool.[1] Appellants' attempt to distinguish the *Buttermore* release is therefore in vain and the trial court is correct in its conclusion that appellants

1. We note our awareness of *Harrity v. Medical College of PA Hospital,* 439 Pa.Super. 10, 653 A.2d 5 (1994), a case addressing the same issue confronted by the *Buttermore* Court and presently before us. However, the release in *Harrity* applied only to certain claims for which causes of action were brought against a certain defendant in the underlying suit. The *Harrity* court explicitly distinguished *Buttermore* and other cases in which the releases applied to " 'any and all' injuries" arising from the underlying accident. *Id.* at 21, 653 A.2d at 11. As noted, the release before us applies to "any and all known and unknown injuries." Thus, our facts are more akin to *Buttermore* and *Harrity* is distinguishable.

released appellees from all claims for injuries arising out of the January 5, 1987 accident.

However, this conclusion cannot end our inquiry. The true issue in this case is not whether the release forecloses future claims for injuries suffered when Mr. Brown fell from the stool, because it surely does, but whether the impotence suffered by Mr. Brown was caused by his fall from the stool. If the impotence was so caused, then Mr. Brown's right to sue for the negligent implantation of the prosthesis, which was a treatment for the impotence, is precluded by the release.

Appellants claim "[t]he history, etiology and specific reasons which led the Appellant to treat with the Defendant/Appellee were unknown. . . . As no causative link could be established between the subsequent medical treatment issued by the Appellee and the Plaintiff/Appellant's original injury in the first lawsuit, then obviously the release executed in the first lawsuit could not be construed to include the medical Practitioner/Appellee in the later suit." (Appellants' brief at 5.)

Appellants' assertion that they are unaware of any "causative link" between Mr. Brown's fall and his impotence is belied by a review of the pleadings filed by appellants in their products liability suit. Indeed, not only did appellants allege the existence of such a link, but they also sought to prove it via expert medical testimony. Appellants' supplemental pretrial statement filed in the former action identifies R.C. Lin, M.D., as an expert medical witness and describes the nature of his proposed testimony as follows:

Dr. Lin will be called to testify that Mr. Brown's penile prosthesis surgeries were necessitated by impotence resulting from his 1987 accident.

(Plaintiff's Supplemental Pretrial Statement, p. 3, filed at Allegheny County G.D. 88–04918.)

Appellants' apparent awareness of the causative link between the fall and impotence is further confirmed by Mr. Brown's deposition testimony, as follows, in the instant action:

Q [BY APPELLEE'S ATTORNEY] All right. So it would be fair to say that the problem in maintaining an erection was one that you had had since 1987, after the fall?

A Yeah.

Q Or after the stool collapsed?

A That's correct.

Deposition of Russell Brown, 3/27/91, p. 40.

Q My understanding of your testimony is that you associate your ability to maintain an erection with a pain in your back, as a result of 1987 fall. Has anyone, any physician ever offered you any reason or their opinion as to why you had the inability to maintain an erection?

A No, because before that I was maintaining an erection. I had no problem.

*Id.* at 49.

Q [Did] any doctor [confirm] the back pain was the reason [you] couldn't maintain an erection?

A Yes.

Q When did you first have that confirmed?

A Dr. Hanley and Moossy did the surgery on my back. After I got out of Harmarville, because I come right out of the hospital, two weeks at home and then I went to Harmarville. I was out of Harmarville, and I mentioned it to them, because I was telling them I was having a hard time, so much pain in my back and then they said you go see a urologist.

*Id.* at 50.

Appellants' offer of expert testimony in the products liability action and Mr. Brown's deposition testimony in the instant action clearly establish that the 1987 fall caused Mr. Brown's impotence. This is especially true in light of the fact that appellants, beyond their self-serving assertions, have offered no proof in the present case tending to rebut their prior assertion that the fall caused Mr. Brown's impotence. Thus, impotence was an injury "sustained or received on or about the 5th day of January, 1987" and the release therefore precludes any suit alleging negligent treatment of impotence.

Our conclusion is further compelled by the fact that appellants executed the release eighteen months *after* they filed the malpractice suit. Hence, they were clearly aware of the alleged malpractice when they relinquished their rights in exchange for $250,000.[2]

In sum, because appellants identified impotence as an element of injury in their products liability action, the settlement in that action represents compensation for impotence. The release therefore includes impotence and appellants may not now claim otherwise in order to pursue a second satisfaction for the same injury.

Lastly, appellants claim that they had "implied contractual claims" against appellee which survived the release. (Appellant's brief at 7.) Initially, we note that appellants first raised this claim in their statement of matters complained of on appeal and it is not therefore properly before us. Further, in the absence of a special contract whereby the physician expressly promises a certain result, it is clear that a physician does not guarantee a favorable result. *Grubb v. Albert Einstein Medical Center*, 255 Pa.Super. 381, 387 A.2d 480 (1978). Thus, appellants' "implied contract" argument fails.

Based on the foregoing, we affirm the May 19, 1994 Order granting summary judgment to appellees.

Order affirmed.

McEWEN, J., filed a dissenting statement.

**2.** On this basis, we distinguish *Vaughn v. Didizian*, 436 Pa.Super. 436, 648 A.2d 38 (1994), a case offered in support of appellants' position that their medical malpractice action survives the release. Indeed, in *Vaughn*, a case wherein the release was signed seven months prior to the plaintiff treating with the defendant/physician, our Court specifically distinguished cases in which, as here, the alleged malpractice predates the release. The Court held:

In the case cited by our distinguished colleague in dissent ... and in each case by Didizian ... the cause of action accrued *prior* to the execution of the release. In this case, the cause of action accrued *after* the release was executed. Thus, reliance on these cases is misplaced.

*Id.* at 440, 648 A.2d at 41.

Similarly, because appellants' "cause of action accrued prior to the execution of the release," their reliance on *Vaughn* is misplaced.

McEWEN, Judge, dissenting.

While the author of the majority Opinion has, in his usual fashion, provided a perceptive analysis and persuasive expression of view, I am compelled to this dissent, because, simply put, I cannot agree that the "ordinary meaning" of the release precludes appellants from suing appellee for medical malpractice. Scrutiny of the factual and procedural chronology serves to illuminate the analysis and assembly of rationale for this dissent:

> January 5, 1987 Russell Brown suffers injury when the stool upon which he was sitting collapsed.

> March 22, 1988 Appellants commence a products liability action against the manufacturer and retailer of the stool.

> April 14, 1989 Appellee, Jay B. Herman, M.D., surgically implants a penile prosthesis in Russell Brown.

> July 27, 1990 Appellants commence a medical malpractice action against Jay B. Herman, M.D., the suit which is the subject of this appeal.

> January 29, 1992 Appellants settle, discontinue, and end the products liability action by execution of the release which is the focus of this appeal.

The release which is the focus of our study and which terminated the products liability claims and suit recites:

FOR AND IN CONSIDERATION of the sum of Two Hundred Fifty Thousand Dollars ($250,00.00) to us in hand paid by Admiral Industries, Montgomery Ward & Company and Scottsdale Insurance Company, ... *we,* Russell Brown and Roselyn Brown ... *discharge the said Admiral Industries, Montgomery Ward & Company and Scottsdale Insurance Company (Releasees)* AND ANY AND ALL OTHER PERSONS, INSURERS, FIRMS, PARTNERSHIPS, AND CORPORATIONS which are or might be claimed to be liable to us, ... from any and all actions, causes of actions, claims and demands of whatsoever kind or nature *on account of* any and all known or unknown *injuries,* losses and damages ... *sustained* or received *on or about the 5th day of January, 1987,* when ... I, Russell Brown, fell from a

chair/stool, . . . on account of which suit was brought at No. G.D. 8–04918 in the Court of Common Pleas of Allegheny County, it being understood and agreed that the acceptance of said sum is in full accord and satisfaction of a disputed claim and that the payment of said sum is not an admission of liability by the above named Releasees. (emphasis supplied)

The majority quite correctly states that Pennsylvania law requires that the release be interpreted according to its *ordinary meaning.* For my part, the *ordinary meaning* of the aforementioned release to any layperson, be he or she a butcher, baker, or candlestick maker, would not encompass a release for the injuries caused by a surgical misprocedure performed by Jay B. Herman, M.D., at Shadyside Hospital on April 14, 1989, some 27 months after the collapse of the faulty stool, especially where a separate and distinct lawsuit seeking damages for the asserted medical malpractice had been filed on July 27, 1990, 18 months prior to the execution of the instant release on January 29, 1992.

It must be acknowledged that appellate case law concerning the meaning of the terms of releases is the subject of firm differences even among the wise and venerable jurists of the Commonwealth. Moreover, the majority certainly provides sound and valid authority for its conclusion. Nonetheless, I find the harmony of *ordinary meaning* in the rendition of this Court in *Republic Insurance Company v. Paul Davis Systems, Inc.,* 431 Pa.Super. 30, 635 A.2d 1056 (1993), *appeal granted,* 540 Pa. 602, 655 A.2d 990 (1995), as our eminent colleague, Judge James R. Cavanaugh, in reliance on *Sparler v. Fireman's Insurance Co.,* 360 Pa.Super. 597, 521 A.2d 433 (1987), *appeal denied,* 518 Pa. 613, 540 A.2d 535 (1988) and *Farrell v. Lechmanik, Inc.,* 417 Pa.Super. 172, 611 A.2d 1322 (1992), opined for a unanimous panel:

In Pennsylvania, the effect of a release is determined by its language which must be interpreted according to its *ordinary meaning.* Since the present release unambiguously releases "all persons" from "all actions", it would initially appear that the trial court was obviously correct in conclud-

ing that the release was an effective bar to Republic's action. . . . [D]espite the general terms of a release, it is not effective to bar a suit for a different cause of action (contract-tort) when it was given for a separate cause of action (tort-wrongful discharge). . . . [A]lthough the terms of a general release may be broadly interpreted even to include unnamed parties, it may only serve to release those persons who might reasonably be considered to be within the ambit of responsibility under the asserted and released cause of action. The release given here was for a discrete contract claim (homeowner's insurance) whereas the court enforced it as to a tort claim.

*Republic Insurance Company v. Paul Davis Systems, Inc.,* *supra* at 31–32, 635 A.2d at 1057–58.

Thus it is that I would vacate the order granting summary judgment and remand the case for the trial of the malpractice claims of appellants against Jay B. Herman, M.D.